IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ROBERT I. SNELL, CONSTANCE M. SNELL, and DANIEL I. SNELL, as the individual owner of the F/V ICELANDER,<br><br>Plaintiffs,<br><br>v.<br><br>YAQUINA BAY, INC. a Washington corporation,<br><br>Defendant. | CV-05-449-PK<br><br>FINDINGS OF FACT & CONCLUSIONS OF LAW |

PAPAK, Magistrate Judge:

This is an action brought by the owners of the F/V ICELANDER seeking a determination of fault and recovery of damages incurred after the F/V AJA struck and sunk the ICELANDER on August 15, 2002.[1] Following a bench trial on the merits of this case, I now issue my findings of fact and conclusions of law in accordance with Federal Rules of Civil Procedure 52(a).[2]

---

[1] The plaintiffs originally named as additional defendants "DOES 1 through 10, as individuals in personam." These individual defendants have not been identified and no claims have been pursued against them. Moreover, the Federal Rules of Civil Procedure do not allow for Doe defendants. Accordingly, the DOE defendants are *sua sponte* dismissed.

[2] Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law more properly deemed a finding of fact, should be so construed.

Page 1 - FINDINGS OF FACT & CONCLUSIONS OF LAW

FINDINGS OF FACT

1.  In August 2002, the F/V AJA was a bottom trawler owned and operated by defendant Yaquina Bay, Inc. The AJA was a medium-sized fishing vessel at 70 feet long and displacing 121 gross tons.

2.  In August 2002, the F/V ICELANDER was owned by Robert Snell ("Snell"), Constance Snell and Daniel Snell. She was 40.75 feet long and displaced 27 gross tons. She was equipped as a combination salmon-tuna troller and had a refrigeration plant suitable for Frozen at Sea (FAS) fish sales. Because the ICELANDER was equipped with FAS capabilities, Snell was able to sell his product to specialty markets and demand a higher price per pound than non-FAS fish.

3.  On August 12, 2002, the AJA left Newport, Oregon for a fishing trip. She was manned by a crew of three. The captain was Ken Yada ("Yada"). There were two deckhands aboard – Colby McKibben ("McKibben") and McKibben's cousin Jeremy Lacewell ("Lacewell"). The crew fished around the clock and slept only a couple hours during the trip.

4.  Lacewell was young, inexperienced and untrained at the wheel. He was not employed full-time on the AJA, but instead was a fill-in for this three day trip. He had worked only one other short trip on the AJA as a fill-in.

5.  In the early afternoon of August 14, 2002, the AJA stopped fishing and headed back toward Newport. Around 11:00 p.m., Lacewell was assigned to wheel watch while Yada and McKibben retired to sleep. While Lacewell was at the wheel, the AJA was on autopilot following a course that had been set by Yada.

6.  Weather conditions were good that night. The seas were calm and visibility was at six nautical miles. Earlier in the day, there was some patchy fog but by nightfall the fog had cleared.

7. At the time Lacewell took over control of the AJA, the ICELANDER was nine miles northwest of Depoe Bay, Oregon. This area is heavily fished by salmon trollers in August because salmon are returning to the mouth of the nearby Siletz River. It is customary for trollers to fish this area during the day, and then drift at night to rest their small crew. Lacewell, McKibben and Yada were aware of this custom. There are no shipping lanes in this area.

8. Snell and his deckhand Chad Goodell ("Goodell") made up the ICELANDER's crew on August 14, 2002. Goodell went to sleep at 10:00 p.m., and Snell stayed up to do routine maintenance. Snell also continued to periodically check his radar and keep a watch for approaching vessels or dangers. The last time he checked his radar was sometime between 11:30 and 11:45 p.m. Snell checked to make sure the ICELANDER was positioned within 2 miles of another fishing boat in order to make a better radar target. He then turned off his radar and returned to doing maintenance.

9. Just after midnight on August 15, 2002, the AJA broadsided the ICELANDER on her starboard side just behind amidships. Lacewell did not see the ICELANDER until the AJA was almost on top of it and collision was imminent. The damage to the ICELANDER was severe, and she sank within a few hours. Snell and Goodell escaped without injury and were taken aboard the AJA.

10. The ICELANDER was lit by a mast light and a strobe light. She was equipped with a largely metal superstructure and had a radar reflector mounted on her mast to make a better radar target.

11. The AJA was equipped with a Furuno radar that was designed for small fishing boats and pleasure craft.

12.     The AJA also had a bridge alert. A bridge alert is an alarm system designed to sound at regular intervals unless the person on wheel watch punches it before it sounds. The purpose of a bridge alert is to keep the person on wheel watch alert and awake. The AJA's bridge alert was not used because it would wake up the entire crew when it went off.

13.     After the sinking of the ICELANDER, the Snells immediately began looking for a replacement vessel. Because the ICELANDER was a combination salmon-tuna troller, newly equipped for crabbing, and had FAS capabilities, it was a relatively unique vessel for this area. Snell was unable to find a comparable vessel on the market. On September 10, 2002, he purchased the F/V BARBARA JO, a thirty-two foot boat equipped for crabbing which they were able to use by opening day of crabbing season in October 2002. The BARBARA JO is also a salmon troller, but it does not have a FAS freezer plant. On March 23, 2003, they purchased the F/V STARWEST, a combination salmon-tuna troller with a FAS freezer plant.

14.     Pacific Trollers Fund ("PTF") insured the ICELANDER. The PTF is a self-funded hull and machinery pool for fishing vessel owners that are members of a seafood producers cooperative. On September 3, 2002, the PTF paid Snell $60,000 for the loss of the ICELANDER. The PTF then settled with the AJA's insurer for $30,000. Snell did not participate in the settlement between the PTF and the AJA's insurer.

CONCLUSIONS OF LAW

In cases involving maritime collision, fault is determined under a comparative negligence standard. United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 411 (1975). The court must evaluate the various statutory violations and other contributory faults which might have been factors in the collision. Id. The court then determines from the particular circumstances of the collision the relative degree of fault of each party. Id.; Stevens v. F/V Bonnie Doon, 655 F.2d

Page 4 - FINDINGS OF FACT & CONCLUSIONS OF LAW

206, 208 (9th Cir. 1981); Complaint of Paducah Towing Co., Inc., 692 F.2d 412, 426-27 (6th Cir. 1982).

**A. Statutory Violations**

Under The Pennsylvania rule, a vessel that violates a statutory rule intended to prevent collisions is presumed to be the contributing, if not the sole, cause of the incident. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136 (1873). If a party establishes a violation of a statutory rule, The Pennsylvania rule shifts the burden of proof to the party in violation of the statutory rule to prove that "the violation could not reasonably be held to have been a proximate cause of the collision." Trinidad Corp. v. SS Keiyoh Maru, 845 F.2d 818, 824 (9th Cir. 1988). In this case, each party alleges the other violated several COLREGS[3], which are applicable statutory rules intended to prevent collisions.

**1. The Lookout Rule - Rule 5**

Each party contends the other violated COLREGS Rule 5 which provides:

> Every vessel shall at all times maintain a proper look-out by sight as well as by hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

The Supreme Court emphasized the importance of this rule in The Adriane, 80 U.S. (13 Wall.) 475, 478-79 (1861) when it wrote:

> The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel, with all the property and the lives of all on board. . . . In the performance of this duty the law requires indefatigable care and sleepless vigilance.

---

[3] International Regulations for Preventing Collisions at Sea, Oct. 20, 1972, 28 U.S.T. 3459, T.I.A.S. 8587 adopted by statute at 33 U.S.C. 1602 ("COLREGS").

The plaintiffs argue that the ICELANDER was not subject to the statutory duty to maintain a lookout. Instead, they contend there is a prevailing custom that fishing boats drift at night off the coast of Oregon without a lookout. However, evidence of a prevailing custom can be used as a basis for determining or excusing negligence only "if it does not completely contradict a statutory rule of navigation." Stevens v. F/V Bonnie Doon, 655 F.2d 206, 208 (9th Cir. 1981). The prevailing custom of drifting at night without a lookout does contradict Rule 5 which is a statutory mandate requiring a lookout at all times. Trinidad Corp. v. S.S. Keiyoh Maru, 845 F.2d 818, 826 (9th Cir. 1988). The ICELANDER failed to keep a proper lookout. While Snell did periodically check his radar and make visual observations of his surroundings, it was not sufficient to satisfy the strict statutory duty of Rule 5. The plaintiffs failed to overcome the presumption that violation of this statutory rule was a proximate cause of the collision.

The AJA also violated Rule 5 by failing to have a competent and alert lookout. Lacewell lacked proper training and experience at the wheel of the AJA, particularly at night. Having only spent a few days on the AJA, he was not familiar with its systems. In addition, Lacewell only got a few hours of intermittent sleep in the twenty-four hours preceding the collision. In sum, Lacewell was not a lookout "of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of that duty." Chamberlain v. Ward, 62 U.S. (21 How.) 548, 570 (1859). "It is axiomatic that an 'inefficient lookout is equivalent to none.'" In re Complaint of Interstate Towing Co., 717 F.2d 752, 755 (2nd Cir. 1983)(quoting Sun Oil Co. v. S.S. Georgel, 245 F.Supp. 537, 545 (D.C.N.Y. 1965), aff'd, 369 F.2d 406 (2nd Cir. 1966). The AJA's failure to have a competent lookout was a proximate cause of the collision.

### 2. Rule 7 – Steps to Avoid Collision and Use of Radar

Each vessel contends the other violated COLREGS Rule 7 which provides:

Page 6 - FINDINGS OF FACT & CONCLUSIONS OF LAW

> (a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.
>
> (b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

The AJA violated COLREGS Rule 7. First, the AJA entrusted a tired and inexperienced deckhand to navigate through known fishing grounds at night. Lacewell did not know how to properly use radar and lacked the experience and training to analyze and appreciate the risks of collision the AJA faced. Second, the AJA was not equipped with appropriate radar for a vessel of her size and use. Third, the AJA did not make use of the radar system and other collision avoidance systems it had in place. The AJA's violation of Rule 7 was a proximate cause of the collision.

Under the circumstances, Snell took appropriate steps to determine the risk of collision and to avoid collisions. Weather conditions and visibility were good. The ICELANDER was not in a shipping lane, and Snell made periodic visual checks and looked at his radar not long before the collision. The ICELANDER was well-lit and a good radar target. The ICELANDER was in an area where it is a widely practiced custom for salmon trollers to be drifting at night. Other vessels, including crew members on the AJA, are well aware of this custom and take extra care when maneuvering at night where salmon trollers may be.

**3. Rule 8 - Action to Avoid Collision**

The parties contend that each violated COLREGS Rule 8 which provides:

> (a) Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

Page 7 - FINDINGS OF FACT & CONCLUSIONS OF LAW

The language of Rule 8 contemplates that one or both vessels attempted to react to a potential collision or at least had time to react and make adjustments to speed or course. That is not the case here. Under these circumstances, neither party had an opportunity to avoid the collision by adjusting course or speed, and it cannot be said that a proximate cause of the collision was a violation by either party of Rule 8. See e.g., Tunney v. McKay, 2000 WL 33116537 (D. Conn. 2000) (no Rule 8 violation where no time for either boat to change course or otherwise avoid collision).

Other assignments of negligence and alleged proximate causes of the collision have been considered and rejected as not supported by the evidence in this case.

**B. Comparative Negligence / Apportionment of Fault**

Having found that each party's negligence contributed to the collision, the court must now apportion fault. United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 411 (1975). All members of the AJA crew knew of the prevalence of trollers drifting at night, and Snell took reasonable precautions to make his vessel visible by sight and by radar. See Stevens v. F/V Bonnie Doon, 655 F.2d 206 (9th Cir. 1981)(evidence of prevailing custom relevant factor in apportioning fault). As between the two vessels, the court finds that the majority of fault lies with the AJA. The primary and substantial cause of the collision was the entrustment of the AJA to Lacewell and his subsequent failure to watch for and avoid collision with the ICELANDER. Part of the fault must nonetheless fall to the ICELANDER. Accordingly, the court allocates 85% of the fault to the negligence of the defendant and 15% of the fault to the negligence of the plaintiffs.

**C. Damages**

The measure of damages in a case of total loss of a vessel is the fair market value of the vessel.  Oliver J. Olson & Co. v. American S.S. Marine Leopard, 356 F.2d 728, 733 (9th Cir. 1966).  Fair market value should generally be established by evidence of contemporaneous sales of like vessels.  Standard Oil Co. of New Jersey v. Southern Pac. Co., 268 U.S. 146, 155-56 (1925).  However, the court may use other means to establish fair market value based upon "reasonable judgment having its basis in the proper consideration of all relevant facts."  Oliver J. Olson, 356 F.2d at 733 n.1.

In this case, expert testimony established that combination vessels with an FAS freezer plant like the ICELANDER had are rare, as are comparable sales for such vessels.  The only known sale of a similar combination vessel was of the F/V WIDE WEST which sold for $300,000, but that vessel had a steel hull as opposed to the ICELANDER's wood hull which has a lesser value.  Other expert testimony established fair market value between $95,000 and $150,000.[4]  The court finds that the evidence supports a fair market value for the ICELANDER at the upper range and places the value at $150,000.  The plaintiffs' recovery will be reduced by $60,000, the amount they already received for the loss of the ICELANDER.

The ICELANDER was also fully equipped with tools, fishing gear, and personal items valued by Snell at $32,937.  The defendant contends that Snell's valuation of these items is overstated and that some of the plaintiffs' evidence does not match with appropriate receipts or documentation.  The court agrees.  Nonetheless, in ascertaining damages this court will follow

---

[4]Snell, who not only has 20 years of commercial fishing experience, but a Ph.D. in applied mathematics, placed the fair market value of the ICELANDER in the range of $100,000 to $150,000.  He based his opinion on his general knowledge of the industry and based on the money the ICELANDER could generate by fishing salmon, tuna and crab.  The court finds that Snell is a credible, fair and knowledgeable expert on this subject.  The court also considers the opinion of Scott Meier relevant and helpful for making a fair market value determination.

Page 9 - FINDINGS OF FACT & CONCLUSIONS OF LAW

the principle of *restitutio in integrum*, which requires that the injured party be fully compensated for the loss sustained. Bonnie Doon, 731 F.2d at 1436. To completely deny recovery for loss of personal property would violate that principle. The court finds that the plaintiffs are entitled to recover a reasonable amount for the loss of their personal items and awards them $20,000 for these items. The plaintiffs are not entitled to separately recover what they refer to as boat supplies, refrigeration and safety/navigation items because the evidence shows that these items are typically included in the sale of a vessel and are more properly considered as part of its fair market value.[5]

The plaintiffs are also awarded $3,000 for the 100 lost salmon[6] on board at the time of the collision. The defendants contend that the plaintiffs failed to prove there were 100 fish in the hold at the time the ICELANDER sunk. However, Snell and deckhand Chad Goodell were credible witnesses and the court accepts their testimony on this issue.

The plaintiffs also seek damages for lost profits. In cases of total loss of a vessel, lost profits or loss of use damages are not typically recoverable. The reason behind the rule is that a vessel owner has a duty to mitigate damages by immediately replacing the vessel. Barger v. Hanson, 426 F.2d 640, 642 (9th Cir. 1970). In this case, Snell immediately began a broad search for a vessel to replace the ICELANDER, but because his vessel was so uniquely equipped there were no comparable vessels available on the market at the time. Snell purchased the F/V

---

[5] The plaintiffs sought damages in the amount of $30,743 for these items. That figure has been taken into consideration in assessing the fair market value of the ICELANDER.

[6] Although Snell calculated damages for lost fish based on sales at $4.50 per pound, less $1.00 for overhead and costs of sale, the court finds that the evidence supports a lesser price per pound. While Snell's fish receipts show some sales in the range $4.50 per pound, there were also many sales at a markedly lower price per pound. A $4.00 per pound price, less $1.00 for overhead and costs of sale, is the basis used for lost fish damages.

Page 10 - FINDINGS OF FACT & CONCLUSIONS OF LAW

BARBARA JO on September 10, 2002. Despite diligent efforts to mitigate his damages, Snell still lost the opportunity to fish for salmon between August 15, 2002 and September 10, 2002. Under these unique circumstances, and again abiding by the principle of *restitutio in integrum*, the court awards $17,442 for the remainder of August 2002, and $6,060 for September 1 through September 10, 2002.[7] Having awarded lost profits, the court will not award prejudgment interest. See, Barger, 426 F.2d at 642 (award of lost profits allowed in cases with unique circumstances and where prejudgment interest not awarded). The plaintiffs' requests for additional damages are denied.

///

///

///

///

///

///

///

## CONCLUSION

Based on the foregoing, the court concludes that the defendant is 85% at fault and the plaintiffs 15% at fault for the collision of the F/V AJA and F/V ICELANDER. The loss to the plaintiffs is $136,502 which will be reduced to $116,026.70 for comparative negligence. Judgment will be entered by separate document.

---

[7]This damage calculation is again based on $4.00 per pound, less $1.00 for overhead. The projected catch is based upon the ICELANDER's five year average catch for these time periods (5,814 pound average for August 15-31, and 2,020 pound average for September 1-10). The court declines to add a multiplier based upon the catch brought in by the entire Newport fleet during the same time periods.

Dated this 24th day of August, 2006.

       /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge